181 P.2d 192
## STATE v. HANSEN.
### No. 7352.

Supreme Court of Idaho.
May 20, 1947.

John R. Black, of Pocatello, for appellant.

Robert Ailshie, Atty. Gen., and J. R. Smead, Asst. Atty. Gen., for respondent.

See also: Atles v. U. S., 3 Cir., 50 F.2d 808, 78 A.L.R. 435, and note, 439, citing copious authority; State v. Eggleston, 201 Iowa 1, 206 N.W. 281; State v. Buck, 88 Kan. 114, 127 P. 631, 42 L.R.A.,N.S., 854, Ann.Cas.1914B, 730 (poison-odors compared).

AILSHIE, Justice.

Appellant, charged with the crime of unlawful sale of intoxicating liquor, second offense, was tried before the court and a jury. Verdict of guilty was returned and appellant was convicted and sentenced to be punished by imprisonment in the county jail for six months and pay a fine of $500; and if he "shall fail, neglect, or refuse to pay the fine heretofore imposed as hereinabove recited, that he be retained and imprisoned in the Bingham County jail for a period of time equivalent to one day for each two dollars representing the aggregate amount recited herein as fine imposed against the said defendant." From the judgment he has appealed.

N. C. Spellman, resident of Coeur d'Alene, and L. Harold Drayney, of Burley, went to Blackfoot September 11, 1946, as investigators for the state liquor law enforcement. Spellman had been engaged in law enforcement work for approximately eight years; Drayney had been employed "with law enforcement off and on for about seven years." Spellman's testimony, with reference to the investigation, was as follows:

"We stopped at the Eccles Hotel [in Blackfoot] and attempted to get a room * * * Then we came down on Main Street. * * * we walked into Henry's Cigar Store and bought a drink of liquor apiece in there.

"Q. After you left Henry's Cigar Store, where did you go? A. We went to the Empire Bar.

"Q. At approximately what time did you go into the Empire Bar? A. In the neighborhood of 6:30 I think.

"Q. What did you do after you arrived there? A. We bought a drink of whiskey apiece.

"Q. And will you tell the jury who ordered the drink? A. Well, we ordered our choice. Each ordered straight whiskey.

"Q. And how many bar tenders were there on duty at that time that you observed? A. Just one that I noticed.

"Q. And is that gentleman present in the court room at the present time? A. Yes.

"Q. Is that the gentleman sitting with Mr. Black? A. Mr. Hansen, yes.

"Q. How was the liquor served to you? A. In a small glass, an ounce or so.

362

"Q. And it was straight whiskey I understand you ordered? A. Yes.

"Q. What did you receive? A. Straight whiskey.

\* \* \* \* \* \*

"Q. And are you familiar with the taste, odor or smell of whiskey? A. I am.

"Q. How much was paid for the drinks of whiskey that were served to you? A. Fifty cents each.

"Q. This establishment at which you purchased this liquor is known as the Empire Bar, you say? A. Yes, that is the way it is advertised.

"Q. And in what county is that located, do you know? A. This county, Bingham County.

\* \* \* \* \* \*

"Q. To whom was the money paid for the whiskey? A. To the bar tender.

"Q. That is the defendant in this case? A. Yes.

"Q. Did you know him by name at that time? A. Not at that time, no.

"Q. And did you subsequently ascertain who he was and what his name was? A. Yes.

"Q. Who identified him for you? A. By the description we gave, yourself and Mr. Belnap.

"Q. Sheriff Belnap? A. Yes.

\* \* \* \* \* \*

"Q. Did you see Mr. Belnap at any time up until the time you went to the Empire Bar? A. No, we didn't.

"Q. Did you see the sheriff at any time later that evening? A. Not that I remember, no.

\* \* \* \* \* \*

"Q. Had you met Mr. Belnap prior to that time? A. Yes.

"Q. You knew he was the sheriff of Bingham County? A. Yes, I did.

"Q. He didn't go with you when you went around to make these purchases of whiskey. Did you call him or any of his deputies to assist you in this investigation? \* \* \* A. No.

"By Mr. Black:

"Q. Now, Mr. Spellman, you say that you and Mr. Drayney went into the Empire Bar about 6:30. Is that about right? A. That is about right, yes.

"Q. When you went in there, you didn't buy a drink there did you, on that occasion? A. I bought two drinks in there—one apiece.

"Q. But did you buy the drinks or did Mr. Drayney buy the drinks? A. Mr. Drayney paid for it.

"Q. You didn't buy a drink in there at that time did you? A. I didn't take any money out of my pocket and pay for it.

"Q. That is what I mean. You didn't buy a drink? A. No.

"Q. Now, after this drink—let me ask you this: You say that you can tell whiskey when you taste it, is that right? A. That is right.

"Q. And you are sure of that? A. Pretty sure, yes.

"Q. You have had lots of experience tasting it? A. I have tasted quite a little, yes.

"Q. So you feel like you know whiskey when you taste it? A. That is right.

"Q. Do you know what brand of whiskey it was that you had on this occasion? A. No.

"Q. Did you see any bottle when you went in there? A. Yes.

"Q. You say you saw a bottle? A. Yes.

"Q. What kind of a bottle? A. A fifth of a gallon.

"Q. Did you see this drink come out of the bottle? A. No, I didn't.

"Q. You didn't see it come out of the bottle. All you know is that they set a glass in front of you with some fluid in it which you say is whiskey? A. Yes.

"Q. And you drank that? A. That is right.

"Q. But you don't know what brand it was or what kind it was? A. No.

"Q. Did you bring any part or portion of that whiskey away from that place with you in any container so you could have it tested? A. No.

"Q. You didn't bring any part of that so you can now tell the jury that you had that tested to show that it was whiskey? A. No.

"Q. Did you bring the glass that you drank the whiskey out of? Did you take that with you? A. No, I didn't.

"Q. Did you confiscate the bottle you saw standing there or whatever it was? A. No, I didn't.

"Q. So that all you know about this whiskey is that you and Mr. Drayner went in there, and two glasses were set on the bar with this fluid in them. You each drank that down and Mr. Drayney paid a dollar for them? A. That is right."

Mr. Drayney's account of the investigation was similar to that of Spellman's; he said:

"Q. And exactly what did you say in ordering the drink? A. I just ordered a straight drink of whiskey.

"Q. What did Mr. Spellman order? A. I don't recall. He ordered a drink.

"Q. How many men were on duty back of the bar? A. One is all I recall seeing.

"Q. Is that man present in the court room? A. Yes.

"Q. Was it the defendant Mr. Glenn Hansen sitting with his counsel? A. I think so, yes.

"Q. Is there any doubt in your mind? A. No. * * *

"Q. Are you familiar with the taste and odor of whiskey? A. Yes.

"Q. What was served to you in the Empire Bar on the 11th day of September? A. A drink of whiskey.

"Q. How much was paid for the whiskey? A. $1.00 for two drinks.

"Q. One for Mr. Spellman and one for yourself? A. Yes, sir.

"Q. Did you see anyone else there that you knew? A. No, sir.

"Q. From where did you obtain the money that was used to pay for these drinks at the Empire Cigar Store? A. I received my advance check at Arco from our director of the Department * * * We ordered our drinks. My drink was set up straight in a small whiskey glass, also a glass of water for a chaser. I didn't see the bottle it was served out of * * *

"Q. You think you are able to tell whiskey when you taste it? A. Yes, sir.

"Q. Have you had a lot of experience tasting whiskey? A. I wouldn't say a lot, but I drink whiskey.

"Q. And you know the taste and the smell of it? A. Yes, sir."

On the other hand, appellant Hansen testified substantially as follows: That he had lived about six years in Blackfoot and prior to that he had been county constable at Dubois.

"Q. Now, Mr. Hansen, calling your attention to September 11, 1946, where were you on that day about 6:30 in the evening? A. Well, I don't know for sure. I worked there about that time, but I could have been out. I don't know.

"Q. Were you on shift during that period of time around 6:30? A. That's correct.

"Q. And where? A. At the Empire Cigar Store.

"Q. Is that here in Blackfoot? A. That is right.

"Q. Now, I will ask you, Mr. Hansen, if at about 6:30 you observed there Mr. Drayney or Mr. Spellman in the cigar store. A. No, I didn't.

"Q. Did you see them in there at any time during that evening? A. No, sir.

"Q. Did you see these men in the Empire Cigar Store on any other occasion? A. No, sir.

"Q. When was the first time you ever saw these two men? A. In the court house here.

* * * * * *

"Q. I will ask you, Mr. Hansen, whether or not you sold Mr. Drayney here a drink of whiskey? A. I did not.

"Q. Or Mr. Spellman? A. No. * * *

"Q. While you can't recall these particular gentlemen coming into your place of business or transacting any business with them, you wouldn't say that they weren't in there would you? A. They could have been in there, but I never did see them.

"Q. You don't recall them? A. No.

"Q. According to the best of your recollection you didn't see them and didn't sell any whiskey to either of these two men on

September 11th? A. I never sold no whiskey to nobody.

"Q. At any time? A. No, sir."

The jury evidently believed the testimony of Spellman and Drayney, as they had a right to do.

The proofs were sufficient to show that a sale was made of alcoholic beverage. The jury were justified in accepting the statement of witness who testified that he drank the beverage and that he recognized it as whiskey both by smell and taste. Lewinsohn v. United States, 7 Cir., 278 F. 421; certiorari denied 258 U.S. 630, 42 S.Ct. 463, 62 L.Ed. 800; In re Speer, 53 Idaho 293, 299, 23 P.2d 239, 88 A.L.R. 1086; State v. Doolittle, 58 Idaho 1, 68 P.2d 904.

Where a person enters a place of business where beverages are served and orders whiskey, the presumption is that the beverage served to him is what he ordered and paid for. In State v. McLaughlin, 42 Idaho 219, 221, 245 P. 77, we quoted the following from Lewinsohn v. United States, supra: "The purchaser, upon entering the place, inquired about the price of the whisky, put his money on the bar, and asked for whisky. Defendant poured out some beverage, and gave it to the customer. Presumably the purchaser received what he ordered and paid for." See, also, Ramsey v. State, 132 Tex.Cr.R. 411, 104 S.W.2d 858, 859; State ex rel. Adams v. Chase, 131 Fla. 186, 179 So. 419, 420; 48 C.J.S., Intoxicating Liquors, § 13, p. 145 (defining "whisky"); 91 A.L.R. 520.

There was no error committed by the court in excluding cross-examination of witness concerning his previous occupation or business, (a) because cross-examination was not germane to the testimony in chief by the witness and (b) because no offer was made as to the character or nature of the evidence intended to be elicited. State v. Mugerza, 46 Idaho 456, 462, 268 P. 1; Just v. Idaho Canal Co., 16 Idaho 639, 663, 102 P. 381, 133 Am.St.Rep. 140.

A careful examination of the record discloses that the instructions were fair and covered all the material issues in the case, and the jury were entitled to take and consider them as a whole. Judd v. Oregon Short Line R. Co., 55 Idaho 461, 475, 44 P.2d 291; State v. McClurg, 50 Idaho 762, 801, 300 P. 898; State v. Hargraves, 62 Idaho 8, 22, 107 P.2d 854; State v. Jones, 62 Idaho 552, 113 P.2d 1106.

The contention, that the judgment was erroneous because of the fact that it carried both fine and imprisonment, and the further provision that, in case of failure to pay the fine, the defendant should be imprisoned at the rate of two dollars per day until the fine was either paid or served out, is not sound. State v. Anderson, 31 Idaho 514, 174 P. 124; State v. Goodrich, 33 Idaho 654, 659, 196 P. 1043; State v. Scrivner, 66 Idaho 498, 162 P.2d 897; secs. 19-4022, 19-2417, I.C.A.

In State v. Goodrich, supra [33 Idaho 654, 196 P. 1044], the court said:

"Appellant also complains that the judgment is erroneous, in that in addition to imposing a sentence of imprisonment, and fine and costs, it further provided that in default of payment of the fine and costs the appellant shall be confined in the county jail at the rate of one day for each $2 of the amount of the fine and costs remaining unpaid.

"This question was considered and decided adversely to the contention of appellant in the case of State v. Anderson, 31 Idaho 514, 174 P. 124. We have carefully re-examined the matter, and are satisfied that the California and Utah cases to the contrary should not be followed, and that the conclusion reached in the Anderson case was correct."

Judgment should be affirmed, and it is so ordered.

HOLDEN, J., concurs in the conclusion reached.

GIVENS, Justice (concurring specially).

Conceding it was error to restrict the cross-examination of the witness, Drayney, as to his previous occupations and background, such being more or less pertinent as enabling a jury to determine the credence to be placed in a witness, State v. Fong Loon, 29 Idaho 248, 158 P. 233, 256, L.R.A.1916F, 1198, enough information was elicited to prevent the error from being so prejudicial as to require a reversal.

I concur in the affirmance of the judgment.

PORTER, D. J., concurs in the special concurrence by GIVENS, J.