393 P.2d 342

STATE of Idaho, Plaintiff-Respondent,

v.

Clyde GISH, a/k/a Roy Albert King, Defendant-Appellant.

No. 9384.

Supreme Court of Idaho.

June 19, 1964.

J. Blaine Anderson, Blackfoot, for appellant.

Allan G. Shepard, Atty. Gen., and Thomas G. Nelson, Asst. Atty. Gen., Boise, Dean Williams, Pros. Atty., Bingham County, Blackfoot, for respondent.

KNUDSON, Chief Justice.

At approximately 4:30 p. m. on December 20, 1951, appellant went from his employment to his home in Atomic City, Bingham County and immediately upon entering his

house he locked the door. He then accused his wife of infidelity and for the ensuing several minutes severely upbraided and physically abused her. Thereafter, and while holding a loaded gun at her back, he directed his wife to go to a place of business known as the Twin Buttes Bar and Cafe. Upon arriving at said bar and cafe he instructed her to enter and tell one Eddie Hudson to come out and talk with him. Hudson went to the door and spoke to appellant, following which event one Edward McEvoy, a patron of the place of business, went to the door, and following some exchange of words between himself and appellant, a rifle in the hands of appellant was discharged and McEvoy was killed. Appellant then moved to a window of the building and fired a shot through it, striking Hudson in the back, seriously but not fatally wounding him.

Appellant was charged with murder in the first degree. After having waived a preliminary hearing, he was held to answer to said charge in the district court, Bingham County. The information charging appellant with murder in the first degree was filed January 4, 1952, to which charge appellant entered a plea of "not guilty" and "not guilty by reason of insanity."

Thereafter, and pursuant to order of the district court dated March 26, 1952, appellant was taken to the Idaho State Hospital South where an examination of his mental condition was to be conducted. Thereafter and following a trial held for the purpose of determining whether appellant was insane, a jury, on April 15, 1952, unanimously returned a verdict wherein they found appellant "insane at the present time."

By order of the district court dated and filed the same day, appellant was committed to the State Hospital South "until he becomes sane." He remained under treatment at said hospital until June 5, 1952, at which time he eloped therefrom. His whereabouts was thereafter unknown to the officials of Bingham County until July 27, 1962, at which time he made application under the name of Roy Albert King for a store license at San Jose, California, as a result of which he was identified by finger print as being Clyde Gish. He was returned to Idaho and stood trial on the original charge of murder in the first degree. From a judgment of conviction of voluntary manslaughter this appeal is taken.

Appellant has made 18 assignments of error and has set out 26 numbered paragraphs of points and authorities. We shall not undertake to discuss in detail each of the assignments and propositions of law, but shall confine this opinion to a consideration of the principal questions raised by appellant.

The verdict is attacked as being contrary to the law and evidence, claiming that it

conclusively appears from the evidence that appellant was an insane person on December 20, 1951.

As support for this contention, appellant relies principally upon the testimony of the former Superintendent of State Hospital South, Dr. J. O. Cromwell, a psychiatrist, who, after completing his examination of appellant, which was commenced on December 24, 1951, expressed the opinion that appellant was mentally ill and "was unable to distinguish right from wrong and adhere to the right." While it is true that Dr. Cromwell expressed such an opinion, the record discloses that another qualified psychiatrist, Dr. Charles H. Sprague, expressed the opinion that the appellant, at the time of the shooting, was a sane person and that he, at that time, had the capacity to know right from wrong.

The testimony of other witnesses who observed appellant immediately before and after the shooting, is also in conflict as to how he appeared and acted. One witness, when asked if he noticed anything unusual about appellant immediately after the incident, stated, "Well not any more than he was real nervous"; appellant's wife described him as being "more nervous" on that occasion; another witness, of whom appellant had inquired as to the whereabouts of his wife, quoted appellant as saying, "I have killed two and a few more won't hurt"; appellant was also quoted as saying that he

didn't care much for himself but he hated to have his boy see this; the owner of the bar and cafe quoted appellant as saying to him, "I sure hated to have this happen in your place of business."

Other witnesses testified that "he was just like a maniac he was raving and waiving this gun around in the air"; that "he looked just like someone that was just off his mind at that time."

It is not for the court to inquire as to the credibility of witnesses since that is the exclusive province of the jury to believe or disbelieve the testimony of any witness, or any portion of his testimony. I.C. § 9–201; State v. Cacavas, 55 Idaho 538, 44 P.2d 1110; State v. Hansen, 67 Idaho 359, 181 P.2d 192; State v. Davis, 69 Idaho 270, 206 P.2d 271; State v. Bedwell, 77 Idaho 57, 286 P.2d 641.

The jury, by their verdict, resolved the conflicts and contradictions in the evidence as to appellant's sanity in favor of the contention made on behalf of the state, and since there is sufficient competent evidence to sustain the jury's conclusions in that regard, we find no merit in the assertion that the verdict is contrary to the law and evidence.

Appellant asserts error on the part of the trial court in refusing to admit the transcribed testimony of one Cecil Floyd Barnes, since deceased. The offered tes-

timony was taken at a hearing before the Industrial Accident Board of this state held August 8, 1952, involving a claim for compensation by Everett Hudson, based on the injury inflicted by appellant shortly after McEvoy had been killed (see Hudson v. Roberts, 75 Idaho 224, 270 P.2d 837).

In support of this offer it was stated to the court that Mr. Barnes, deceased, testified on behalf of the state at the sanity hearing held on April 14 and 15, 1952, and that the record of that hearing had been inadvertently destroyed. It was further stated that at the hearing before the Industrial Accident Board Mr. Barnes, as the employer of appellant, testified in some detail as to appellant's conduct, activities and appearance shortly before and after the occurrence on December 20, 1951; that at said hearing the sanity of appellant was in controversy, and that the witness Barnes was under oath and was examined both on direct and cross-examination as to his knowledge and observation of appellant's conduct at the time in question.

The question as to whether evidence taken at a former trial may be introduced at a subsequent trial has been considered by this court. In State v. Brassfield, 40 Idaho 203, 232 P. 1, it was said:

"* * * However, the weight of authority would seem to be that when it appears that the witnesses who tes-

tified at a former trial are beyond the jurisdiction of the court, and the evidence is competent and between the same parties, involving the same issues, and proper diligence to secure their attendance is shown, as in this case, such evidence is admissible, the reason for the rule being that it is the best evidence which can be produced. * * *"

This same rule was applied in State v. Ward, 51 Idaho 68, 1 P.2d 620, in which case the whereabouts of the witness was unknown. In State v. Johnston, 62 Idaho 601, 113 P.2d 809, the witness had died between the dates of the first and second trial, and in affirming the admission of the questioned evidence it was stated, "The testimony of a deceased witness, given at a former trial, may be read as evidence at a subsequent trial between the same parties and involving the same issues." This rule was subsequently enacted into I.C. § 9–206, which provides:

"The testimony of a witness who testified at the trial in an action or proceeding in any district court of the State of Idaho, when transcribed and certified to be true or correct by the court reporter reporting such testimony at such trial or proceeding, shall be admissible at any subsequent trial between the same parties and relating to the same subject matter, when such witness is deceased, absent from the

state or otherwise unavailable or unable to testify as a witness."

In order that testimony given at a former trial may be admissible at a subsequent one, it is not only necessary that the parties and subject matter, or issues, be the same in the two trials, but it is necessary that the party against whom the evidence was offered, or someone identified with him in legal interest, should have had an opportunity to cross-examine the witness. 31A C.J.S. Evidence § 390, p. 959; Tom Reed Gold Mines Co. v. Moore, 40 Ariz. 174, 11 P.2d 347; McInturff et al. v. Insurance Co. of North America, 248 Ill. 92, 93 N.E. 369; Werner v. State Bar, 24 Cal.2d 611, 150 P.2d 892.

In the instant case the parties were not the same as the parties to the hearing before the Industrial Accident Board in Hudson v. Roberts, supra, and the issues involved were not the same. Neither the appellant nor respondent had any opportunity to cross-examine Mr. Barnes at the time his offered testimony was elicited before the Industrial Accident Board.

We do not consider that the cases cited by appellant (Green v. State, 69 Tex.Cr.R. 485, 154 S.W. 1003; Robertson v. State, 63 Tex.Cr.R. 216, 142 S.W. 533) support a different rule, since each of said cases involved a retrial on the same charge. There was no error on the part of the trial court in excluding the offered testimony.

Appellant contends that the trial court erred in refusing to admit in evidence the verdict of the jury and the order of commitment, both dated April 15, 1952, finding appellant to be insane at that time and committing him to the State Hospital South as an insane person. The verdict and order referred to are a part of the record of case No. 1717, which case was heard before the trial court on April 14 and 15, 1952, wherein the issue submitted to the jury was whether appellant was sane or insane at that time. The record before us does not contain a reporter's transcript of the proceedings had and testimony adduced at the hearing of said case No. 1717 —the court reporter's notes and the recording discs of that hearing having been, through inadvertence, destroyed.

The record is not clear on what grounds the trial court denied the offer, however it was argued by respondent that the offer should be denied for the reason that the test which was made of appellant's mental condition at the hearing of case No. 1717, which resulted in the verdict and order offered, was not to determine if appellant, at the time the charged offense was committed, could distinguish between right and wrong, and therefore should not be admitted in evidence. Respondent's said contention is not without merit. The record shows that at the time the information was called for trial a question was raised as to

appellant's sanity at that time, which resulted in the hearing of case No. 1717. The purpose of that hearing was to determine appellant's competency to stand trial and the question there presented to and decided by the jury was whether appellant was insane at that time (which was almost four months after the commission of the crime involved).

■ Insanity at the time of the commission of an offense and insanity at the time of trial are entirely distinct as are the statutes applicable in each instance, and the procedure to be followed in each case. 23 C.J.S. Criminal Law § 940(2) e, p. 737. Such inquiry into the sanity of a defendant is authorized by I.C. ch. 33, title 19.

■ In this regard we quote appropriate statements from 23 C.J.S. Criminal Law § 940(5) b, pp. 747–748:

" * * * The only issue presented at a preliminary trial of present insanity and the test of accused's competency to stand trial, is whether accused has sufficient soundness of mind to appreciate the charges against him, and the proceedings thereon, and to enable him to make a proper defense, and, therefore, whether or not he may be compelled to proceed with the trial of the main issue of guilty or not guilty; or whether he is so mentally impaired as to render it probable that accused cannot, as far as may devolve on him, have a full, fair, and impartial trial.

"Accordingly, the test of accused's sanity at the time of the trial is not ordinarily the test of general insanity or the ability to distinguish between right and wrong, * * *."

"The issue is limited to the competency of accused to stand trial at the time of the trial; and his mental condition at the time of the commission of the crime, or at some other prior time, or what his condition may be at some future time, is foreign to the inquiry."

The verdict or order offered did not show, nor did appellant offer to prove, that the test of insanity made during the trial of case No. 1717 was for the purpose of determining, or attempting to prove, appellant's ability to distinguish between right and wrong at the time of the commission of the charged offense.

At the time appellant's said offer was denied, the trial court commented that evidence of the hearing (had on April 14 and 15, 1952) was fully before the jury. In this connection the record discloses that appellant's counsel was permitted, to some extent, to interrogate his own expert witness, Dr. Cromwell (who was superintendent of State Hospital South, at Blackfoot, Idaho when said hearing was held) relative

to said hearing, of which the following quote is a part. After referring to a sanity hearing held in connection with Mr. Gish, during April of 1952, counsel interrogated said witness as follows:

"Q. Now, did Clyde Gish subsequently leave the State Hospital South while you were still superintendent?

"A. He did.

"Q. Would you describe so far as you can recall now the circumstances under which he departed?

"A. He just walked out.

"Q. Now, the record would show this. Mr. Gish was committed by the District Court in Bingham County following a sanity hearing, which concluded on April 14, 1952. Do you recall the date of his escape or elopment?

"A. Recall it? No. I can look at the record here.

"Q. If you would check the record, and for the record state what date?

"A. The 5th of June, 1952.

"Q. At that time was Clyde Gish kept in maximum security?

"A. No."

■ Under the circumstances of this case the ruling of the trial court complained of did not constitute reversible error.

At the close of respondent's case in chief, appellant moved the court for an instruction to advise the jury to acquit appellant. This motion was renewed at the close of appellant's case in chief and again at the conclusion of respondent's case in rebuttal. The court's refusal to give such instruction is assigned as error.

Such motion is authorized under I.C. § 19-2123, which provides:

"If, at any time after the evidence on either side is closed, the court deems it insufficient to warrant a conviction, it must advise the jury to acquit the defendant. But the jury are not bound by the advice."

■ If there is insufficient evidence to support a verdict of guilty, it is the duty of the court to grant an absolute acquittal under said section. State v. Powaukee, 78 Idaho 257, 300 P.2d 488. However, where there is evidence upon which to base a verdict of guilty, the action of the trial court in denying a motion to advise the jury to acquit is not reversible error. State v. Miller, 52 Idaho 33, 37, 10 P.2d 955; State v. McDermott, 52 Idaho 602, 17 P.2d 343; State v. Emory, 55 Idaho 649, 653, 46 P. 2d 67; State v. Richardson, 56 Idaho 150, 157, 50 P.2d 1012; State v. Stevens, 48 Idaho 335, 349, 282 P. 93; State v. Mundell, 66 Idaho 339, 344, 158 P.2d 799; State v. Gailey, 69 Idaho 146, 150-151, 204 P.2d

254; State v. Dickens, 69 Idaho 497, 498, 210 P.2d 384; State v. McCallum, 77 Idaho 489, 295 P.2d 259.

In the instant case there was ample evidence upon which to base a verdict of guilty and the claimed error is without merit.

Dr. Charles H. Sprague, a psychiatrist, was called by respondent as an expert witness on rebuttal. The doctor's testimony discloses that he first saw appellant about four days after the happening of the charged offense; his qualification as an expert was not questioned, and he expressed the opinion that when the offense was committed appellant was sane and had the capacity to know right from wrong.

Although appellant made no objection to the testimony elicited from Dr. Sprague until after his examination by both parties had been completed and both parties had rested, appellant now claims that the court erred in not granting his motion to strike the testimony of said witness. It is appellant's contention that this testimony was improper rebuttal for the reason that the question of appellant's insanity was raised during respondent's case in chief and therefore the testimony of Dr. Sprague should have been introduced at that time to refute the inference of insanity and not during respondent's case in rebuttal. In State v. Copenbarger, 52 Idaho 441, 16 P.2d 383, it is pointed out that if the proof on the part of the prosecution tends to prove a defense on behalf of the accused, then the state has the burden "to rebut the exculpatory evidence contained in its own case-made by competent evidence, and in such case the burden does not ever shift to the defendant."

I.C. § 19–2101 provides for the procedure to be followed during trial, and after fixing the time when the defendant may offer evidence in support of his defense subsection 4 thereof provides:

"4. The parties may then respectively offer rebutting testimony only, unless the court for good reason, in furtherance of justice, permit them to offer evidence upon their original case."

Proper rebuttal evidence is that which explains, repels, counteracts or disproves the testimony, facts or evidence introduced by the adverse party. State v. Hewitt, 73 Idaho 452, 254 P.2d 677. In this connection attention is also called to I.C. § 19–2102, which provides:

"When the state of the pleadings requires it, or in any other case for good reasons, and in the sound discretion of the court, the order prescribed in the last section may be departed from."

A similar contention was considered by this court in the case of State v. Ellington, 4 Idaho 529, 43 P. 60, wherein it is stated:

"It is objected that the prosecution were allowed to recall certain witnesses to testify in regard to matters which it is claimed were not strictly rebuttal. This is a matter entirely within the discretion of the trial court, and is so made by statute. It would most certainly be a denial of justice to refuse to allow witnesses to be recalled on the part of a defendant on trial for a capital offense merely because of the matters in regard to which they are to testify are not strictly rebuttal, although material, and the same rule should apply to the state."

It was also stated in State v. Mushrow, 32 Idaho 562, 185 P. 1075, that:

"There is nothing in the record before us to show that the appellant was surprised or placed in a position of disadvantage, or denied the opportunity of contradicting or explaining the testimony complained of, or that he was unprepared to do so. He neither claimed surprise, nor asked for a continuance to enable him to better meet the state's evidence. Reversible error cannot be predicated upon such a situation. This is the rule supported by the authorities generally. * * *"

If a party fails to make timely· objection to a departure from the statutory procedure set forth in I.C. § 19–2101, such departure in and of itself is not reversible error. State v. Spencer, 74 Idaho 173, 258 P.2d 1147; Schmidt v. Williams, 34 Idaho 723, 203 P. 1075.

In the instant case, no objection was made at the time the testimony of the witness was introduced and not until the jury had heard it in its entirety. We do not consider this to have been a timely objection. State v. Spencer, supra; Schmidt v. Williams, supra. Appellant conducted a searching examination of the witness and ably attempted to impeach such testimony. Appellant made no claim or showing of surprise, disadvantage, or lack of preparation; he waived his right of sur-rebuttal and did not ask for a continuance to enable him to meet the state's evidence. Since the trial court has a wide range of discretion in allowing rebuttal evidence, State v. Mundell, 66 Idaho 339, 158 P.2d 799; State v. Martinez, 43 Idaho 180, 250 P. 239; State v. Ellington, supra, we find no error on the part of the court in allowing the testimony to be introduced in the procedure which was followed.

Error is assigned to the trial court's refusal to give appellant's requested instruction No. 10, which provides:

"You are instructed that temporary insanity is sufficient to relieve a person

of criminal responsibility if such temporary insanity meets the definition of insane as given in these instructions to you. Temporary insanity is defined as lasting for a time only, existing or continuing for a limited time; not permanent. The law does not require that the insanity relied on as a defense shall have existed for any definite period, but only that it shall have existed at the time when the alleged act occurred with which the accused stands charged and temporary insanity as of the degree or quantity as heretofore defined is a defense."

The court gave appellant's requested instruction No. 7, defining insanity as "a disease which prevents a person from understanding the nature of the act in question and its possible consequences, or, which renders him incapable of resisting the temptation to commit a crime even though he knows that he is doing wrong." [The fact that we have quoted the foregoing definition is not to be considered as constituting approval by this court of the language used therein.] The court also gave appellant's requested instruction No. 9, which provides:

"The law presumes that all men are sane and responsible for their acts. In this case, the defendant has interposed the defense of insanity. The law does not place upon him the burden of proving beyond a reasonable doubt that he was insane at the time the act charged was committed, but only places the burden upon him to raise in your minds a reasonable doubt as to the sanity of the defendant at the time of the commission of the act alleged in the information, then this reasonable doubt must be resolved in his favor and you must acquit him of the crime charged and all lesser included offenses."

The latter foregoing instruction was given as instruction No. 20, and it will be noted that the jury was thereby instructed that if there existed in their minds a reasonable doubt as to the sanity of appellant *at the time* of the commission of the act charged, they must acquit him. There is no inference whatever that only permanent insanity constituted a defense. The language used clearly pointed out that the only period or time when the condition of appellant's mental faculties were involved was *at the time* of the act involved. When all of the instructions given which relate to the defense of insanity are considered, it is convincing that appellant's theory in that respect was adequately presented to the jury.

Complaint was also made of alleged misconduct on the part of the prosecuting attorney during the trial. This claim is predicated upon one question and two re-

marks on the part of the prosecuting attorney.

The alleged improper question was propounded to appellant during his cross-examination, being the last one contained in the following excerpt from the record:

"Q. How long did you say you have been in jail here in Blackfoot?

"A. Six months and about ten days.

"Q. Do you remember the month you came here?

"A. The last day of October.

"Q. And that was from San Jose?

"A. Yes.

"Q. And you were in jail in San Jose?

"A. About a month.

"Q. Have you been in any other jails?"

Immediately after the question had been asked, appellant objected on the ground that it was incompetent, irrelevant and highly prejudicial. The objection was sustained and the jury instructed to disregard the question.

By itself this question was improper as a method of impeaching the witness. Respondent's explanation of a justification of such interrogation is that appellant's testimony had been to the effect that he could not remember anything concerning the crime charged; there had also been testimony that appellant had been held in the Bingham County jail following his arrest on the charge involved during 1951; that it was an attempt to test the recollection of the witness. Although improper, if considered in the context suggested by respondent the prejudicial effect of the question would be greatly reduced. Also, since the court promptly instructed the jury to disregard the question, the possibility of appellant's substantial rights having been affected was thereby materially lessened. State v. Spencer, 74 Idaho 173, 258 P.2d 1147; State v. Owen, 73 Idaho 394, 253 P.2d 203.

The two remarks made by the prosecuting attorney which are claimed to be improper, are substantially alike. They were made during the introduction of a deposition of Dr. Cromwell. We quote one of them:

"MR. WILLIAMS: Your Honor, we of course object, we feel that the entire testimony here—the answers that were given and responses at that time should be given, because this is part of the testimony and deposition of Doctor Cromwell; and to delete them would materially change and color and perhaps create the wrong impression as to what Doctor Cromwell's testimony concerning this man is; we feel it should all be in."

Appellant urges that such comment "could only create the impression that appellant and his counsel were trying to withhold evidence and were engaged in some sort of chicanery," and "the material and obvious effect of this was to prejudice the defense in the eyes of the jury."

Appellant made no objection to the specific remarks above quoted; but did object when substantially the same remarks were made later during the trial. This objection was sustained by the court, and the jury was told to disregard the remarks. Later, and during the closing instructions to the jury, the court admonished them, saying:

"You should not be governed, controlled or prejudiced by any remarks or statements made by either court or counsel in the discussion of questions of law or the admissibility of evidence during the trial."

 Under the circumstances which existed, we do not consider that the question or remarks which we have just considered constituted prejudicial error.

Appellant urges prejudicial error in the refusal of his requested instruction concerning the criminal responsibility of one who commits the offense without being conscious thereof. The following instruction was requested by appellant:

"Where a person commits an act without being conscious thereof, such act is not criminal even though, if committed by a person who was conscious, it would be a crime.

"This rule of law does not apply to a case in which the mental state of the person is due to insanity, mental defect or voluntary intoxication resulting from the use of drugs or intoxicating liquor, but applies only to cases of the unconsciousness of persons of sound mind as, for example, somnambulist, or persons suffering from the delirium of fever, epilepsy, a blow on the head, emotional amnesia, allucinations or delusions sufficient to render a person unconscious but not of such a degree as to be deemed insanity in the legal sense, or the involuntary taking of drugs or intoxicating liquor, and other cases in which there is no functioning of the conscious mind and the person's acts are controlled solely by the subconscious or subjective mind."

Appellant acknowledges that the court correctly gave instruction No. 13, which quotes the applicable portions of I.C. § 18–201, as follows:

"Insofar as applicable to this case, the statutes of the State of Idaho, provide as follows:

"'All persons are capable of committing crimes except those belonging to the following classes.

" '3. Lunatics and insane persons.

" '5. · Persons who committed the act charged without being conscious thereof.

" '6. Persons who committed the act charged or made the omission charged, through misfortune or by accident, when it appears that there was no evil design, intention or culpable negligence.' "

A general statement as to what is contemplated by subsection 5 of I.C. § 18–201 (quoted above in said instruction No. 13) is contained in 22 C.J.S. Criminal Law § 55, p. 194, as follows:

*"Unconsciousness.* A person cannot be held criminally responsible for acts committed while he is unconscious. Some statutes broadly exempt from responsibility persons who commit offenses without being conscious thereof. Such statutes, when construed in connection with other statutes relating to criminal capacity of the insane and voluntarily intoxicated, do not include within their protection either insane or voluntarily intoxicated persons, and are restricted in their contemplation to persons of sound mind suffering from some other agency rendering them unconscious of their acts, such as somnambulism, * * * or delirium from fever or drugs."

Appellant argues that without such an instruction as he requested, a jury could not possibly understand what the statute means when it exempts persons whose actions are controlled by the "unconscious mind" or could well conclude that it means actual or literal unconsciousness. In the latter part of the requested instruction an attempt is made to clarify the concept of "conscious mind" by contrasting it with "subjective mind." This very language was considered by the supreme court of California, in People v. Carter (1961), 56 Cal.2d 549, 15 Cal. Rptr. 645, 364 P.2d 477, wherein the court said:

"Defendant says that the instructions given were inadequate because they contained no 'explanation clarifying the legal concept of consciousness to be applied.' The refused instructions attempt to give such 'explanation.' In this they are not successful. They seek to clarify the concept of 'conscious mind' by contrasting it with 'subjective mind,' but the latter phrase has no legal meaning, is not used in a medical sense in the proposed instruction, and would tend to confuse rather than enlighten the jury."

In the instant case there is no evidence whatever of somnambulism, delirium of fever or epilepsy, as mentioned in the requested instruction. The contention that there is much evidence supporting the theory that

**358**

at the time the offense was committed appellant was actually suffering from emotionally induced amnesia and also that he suffered a blow to his head shortly before the incidents on December 20, 1951, began to occur, is not supported by the record.

It is true that some reference is made to the possibility that amnesia could be induced by an emotional disturbance. However, such evidence is far from sufficient to justify one in concluding that appellant experienced such result. There is also some mention made that appellant bumped his head shortly before the occurrence of the incidents here involved, but the evidence of that happening and its effect, if any, upon appellant is likewise of slight import. The following excerpt from appellant's expert witness, Dr. Cromwell, certainly indicates that no importance, as affecting appellant's mental condition, was given to such incident, if it in fact happened.

"Q. In the course of your examination of Mr. Gish, would you state whether or not he mentioned to you what he thought was a blow on his head shortly before this shooting incident?

"A. Oh, he discussed a feeling that his head had been struck. I believe he said it was by a pipe in the building where he was working, but he had a stocking cap on, and there was no evidence in our examination of any real injury. I don't recall this now. This I recall only because I have reviewed the record."

There was considerable evidence concerning hallucinations and delusions which were experienced by appellant before and after the homicide involved. However, almost without exception such evidence was introduced and considered in support of appellant's defense of insanity. In this connection the following quoted testimony of appellant's medical expert, Dr. Cromwell, is in point:

"Q. Now, Doctor, I don't believe that men of your profession use or like the word 'insane', but as you understand, it is a legal definition. Now keeping in mind the legal use of this word 'insane', are hallucinations and delusions a form of insanity if they are to such an extent that they do overcome and overpower the will?

\* \* \* \* \* \*

"A. Well, answering you in a historical sense, hallucinations and delusions have been considered evidence of insanity for a long time."

The trial court not only instructed the jury in the language of the statute involved, but fully instructed in the following quoted language, regarding the standard of accountability to which the appellant is held:

"You are instructed that should you first find the defendant fired the fatal

shot, then the Court instructs you, that the true test and standard of accountability is:

"Had the defendant sufficient mental capacity to appreciate the character and quality of his acts?

"Did he know and understand that it was in violation of the rights of another and in itself wrong?

"Did he know that it was prohibited by the laws of the State and that its commission would entail punishment and penalty upon himself?

"If he had the capacity thus to appreciate the character and comprehend the possible or probable consequences of his acts, he is responsible to the law for the acts thus committed and is to be adjudged accordingly. A person in the possession of a sound mind who commits a criminal act under the impulse of passion or revenge, which may temporarily dethrone reason, or for the time being control his will, cannot be shielded from the consequences of his act."

The court further instructed that "nothing is to be presumed or taken by implication against the defendant." We are satisfied that under the circumstances of this case the instructions given pertaining to the responsibility of appellant for the commission of an act without being conscious thereof, were adequate and that appellant was in no manner prejudiced as contended.

The remaining assignments of error wherein it is contended that certain of appellant's requested instructions should have been given, are without merit since the instructions given adequately cover the subject matter of the requested instructions.

By the concluding assignment of error discussed in his brief, appellant complains that the trial court failed to consider his application for probation or leniency in sentencing. The record discloses that immediately following a return of the verdict the court announced that sentence would be pronounced on May 27, 1963, at two p. m. On that date appellant moved for extension of time within which to file some motions, whereupon the court continued the matter of sentence until two p. m. on June 10, 1963.

On June 7, 1963, appellant filed his "Application for Probation or For Leniency in Sentencing" in which it was also requested that a pre-sentence investigation be ordered by the court. The court minutes of June 10, 1963, show that on that date

"* * * counsel for the defendant moved the Court for a postponement in this matter until certain Motions could be argued. Motion was denied by the Court, and no legal reason being shown why judgment should not be pronounced,

"IT WAS THE JUDGMENT OF THE COURT That the defendant be sentenced to a term not to exceed ten (10) years in the Idaho State Prison, sentence to begin on defendant's arrival at the State Prison."

The record does not disclose that the court gave any consideration to the application, and it is not contended by respondent that the court did so. It is clear that appellant was not given a hearing on his application.

The record discloses that in excess of eleven years intervened between the commission of the offense and the conviction of appellant. It is stated in his application that during the intervening years he made a good life in society and established a good reputation in the community in which he resided. Appellant's said application was made pursuant to the provisions of I.C. § 19–2601, which statute has, on a number of occasions, been considered by this court. In State v. O'Dell, 71 Idaho 64, 225 P.2d 1020, it is stated that the purpose of the statute is the rehabilitation of a defendant and to give him an opportunity to reform and take his proper place in society. In State v. Ellis, 70 Idaho 417, 219 P.2d 953, and also in State v. Mitchell, 77 Idaho 115, 289 P.2d 315, this court held that when such application is made the trial court "must give consideration to the application and grant or deny the same in the exercise of

a sound, legal discretion." The latest expression of this court concerning the claimed error here considered is contained in State v. Freeman, 85 Idaho 339, 379 P.2d 632, wherein it is stated:

"To fulfill the intendment of the statute, the trial court *must* afford the defendants full opportunity to present evidence in their behalf in mitigation of circumstances or toward those circumstances which may afford an opportunity for rehabilitation whether this be for a lesser term of imprisonment or parole as might otherwise influence the court in passing sentence from the evidence adduced on a trial of the cause." (Emphasis supplied.)

There being no showing that the trial court considered the application, and appellant not having been afforded the opportunity to make a showing in mitigation of the offense or other circumstances, and in keeping with the mandate of this court in the cases above cited this case must be remanded to afford appellant an opportunity to make such showing.

We have considered each of the other assignments of error and find no prejudicial error.

The judgment of conviction of appellant of the crime of voluntary manslaughter is affirmed. However, the cause is remanded to the trial court with direction to set aside

the sentence heretofore pronounced and to afford appellant an opportunity, at a time to be fixed by the court, to make a showing in support of his application for leniency; after considering such showing, if any is made, to grant or deny the application in whole or in part and thereafter to make such disposition of the case as the court may deem proper.

McQUADE, McFADDEN, TAYLOR and SMITH, JJ., concur.